**In re Jerome Thomas METTETAL, Ann Thomas Mettetal, Debtors.**

**John M. WILSON and David M. Wilson, Plaintiffs,**

v.

**Jerome Thomas METTETAL, Defendant.**

**The PATY COMPANY, Plaintiff,**

v.

**Jerome Thomas METTETAL, Defendant.**

**Bankruptcy No. 3–82–01478.**
**Adv. Nos. 3–83–0162, 3–83–0164.**

United States Bankruptcy Court,
D. Tennessee.

May 18, 1984.

Earl R. Booze, Johnson City, Tenn., for plaintiffs, John M. Wilson and David M. Wilson.

O. Taylor Pickard, Jr., Kingsport, Tenn., for plaintiff, The Paty Co.

John H. Fowler, Knoxville, Tenn., for debtors, Jerome Thomas Mettetal and Ann Thomas Mettetal.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether the debtor, Jerome Thomas Mettetal, a general contractor, owes to either the property owner with whom he contracted for construction of a building or to a supplier of materials on the project nondischargeable debts arising out of false pretenses, false representations, or actual fraud, 11 U.S.C.A. § 523(a)(2)(A) (1979), fraud or defalcation while acting in a fiduciary capacity, or embezzlement, 11 U.S.C.A. § 523(a)(4) (1979), or willful and malicious injury to property, 11 U.S.C.A. § 523(a)(6) (1979).

### I

The debtor filed his voluntary petition for chapter 7 relief on October 1, 1982. These two adversary proceedings to determine dischargeability were commenced on February 22, 1983. As a result of the close interrelationship between the operative facts and the theories of the plaintiffs, the court will consolidate for decision both proceedings in a single opinion.

The debtor was the president, sole stockholder, and director of a corporation engaged in the business of construction. Members of the debtor's family held the remaining corporate offices. The debtor, however, directed and controlled all corporate activities, including the making of contracts, the employment of subcontractors, and the purchasing of materials.

These two cases primarily involve three separate construction projects: (1) a professional office building under contract with plaintiffs John and David Wilson, (2) a group of condominiums known as Woodland Park, and (3) four townhouses under contract with Proffitt Properties, Ltd. Both of these cases arise out of the application by the corporation of funds, intended

as payments to be used on a given project, for purposes other than payment for labor and materials on that particular project.

The Wilsons contracted with the corporation for the construction of a professional office building in Johnson City, Tennessee. The original contract sum was $88,766.00, subject to additions and deductions by change order. Progress payments were to be approved by the architect based upon the percentage of work completed and the amount of materials stored on the site. The building was constructed and the plaintiffs made five such payments totaling $95,500.39 from April 26, 1982, to August 2, 1982.

Under the debtor's direction, the corporation did not segregate the Wilsons' progress payments, or any other corporate receipts, in a separate account. Instead, all receipts were commingled in a common corporate account. All corporate debts were paid from this account. Thus, the Wilsons' payments were not earmarked to be applied exclusively to labor and material costs incurred in the construction of their building.

The haphazard condition of the corporate books made it impossible to determine precisely to which project or expense any given disbursement from the corporate checking account related. Some payments bore notations identifying the project to which they applied. Others, however, did not. At least one point is clear: the Wilsons' progress payments were not applied exclusively to labor and material expenses incurred in the construction of their building. The same is true of payments received by the corporation for use on the other two projects.

The poor condition of the corporate records made it possible to verify only $9,823.30 in payments as having been made specifically to suppliers of labor and material on the Wilsons' building. Presumably, more than this verifiable amount must have been applied to the project since the amount of liens ultimately filed for unpaid labor and materials on this particular project totaled only somewhat more than one-third of the amount paid by the Wilsons for the building. In any case, a sizeable amount of the bills for labor and material were not paid. Consequently, various subcontractors and suppliers filed mechanics' and materialmen's liens against the Wilsons' property.[1] The Wilsons eventually paid $10,863.38 to the various claimants in settlement of the liens asserted.

Similarly, there was a considerable discrepancy between the payments received by the corporation for work on the other two projects and the amount of the payments which the corporate records showed were paid for labor and material on the projects. Again, the chaotic state of the corporate records make it impossible to know the true extent of payments actually made by the corporation for labor and material on these two projects.

It is possible to determine the nature of some disbursements from the commingled funds which were not related to labor and material on the projects. For example, from November 5, 1981, through July 29, 1983, the debtor himself received payments in excess of $25,000.00. This amount comprised payments to him for salary, office and equipment rent from the corporation, and repayment of short-term loans which he occasionally made to the corporation. Similarly, from January 8, 1982, through July 22, 1982, the corporation paid more than $31,000.00 to the debtor's mother.[2]

---

1. Liens totaling $35,503.58 were filed against the Wilsons' building for labor and material bills unpaid by the corporation.

2. These payments consisted primarily of loan repayments and rental payments. For example,

on July 5, 1982, she received a $4,200.00 check and on June 28, 1982, she received a $1,500.00 check. The corporate checking account records did not indicate the purpose of these payments. However, the debtor testified that these payments were repayments of loans made by his

These various payments to both the debtor and his mother constituted ordinary and legitimate business expenditures. Funds from the corporate checking account were also used for such non-construction expenditures as life and disability insurance.

The debtor testified that for several years he had followed the "squeaky wheel" approach in paying creditors. In short, he was often unable to pay the corporate debts in a timely fashion and would, thus, informally negotiate extensions of time and payment arrangements with creditors. In general, he paid first those creditors who were most persistent in their demands.

The debtor testified that he was unaware of the extent of the corporation's financial difficulties until only a few days before cash flow problems forced the corporation to cease doing business in mid-August 1982. At the time he made the later payments to himself and his mother he was aware that outstanding labor and material bills remained unpaid; however, he believed the corporation to be in the same basically operable condition it had been in for the past several years.

The debtor first realized the corporation's acute financial difficulties when he became aware of the possibility of foreclosure upon real estate purchased by the corporation for the purpose of erecting the Woodland Park condominium project. The debtor's mother attempted to sell other real estate to raise the necessary funds. However, her efforts were unsuccessful. Only then did the debtor begin to carefully review the records of the corporation and come to appreciate the serious condition of the corporation. The corporation ceased operations only shortly thereafter.

The plaintiff Paty Company was a major supplier of the corporation. From December 1, 1981, through August 1982, the average balance of the debtor's and corporation's account with Paty was $67,741.55, ranging from a high figure of $85,833.00 in May to a low figure of $50,248.00 in August. Since Paty was the corporation's major supplier the debtor was careful to pay any bills more than 90 days old in order to maintain his line of credit. Apparently Paty was relatively satisfied with the debtor's performance, as Paty's credit manager issued a credit statement in January 1982 attesting "all account balances paid as agreed upon." Despite the fact that the corporation continued to charge materials in the last two months of its operation, the balance as of September 1982 was $58,239.00, lower than six of the previous nine months. Paty received approximately $24,000.00 in payments from the corporation during its last two months of operation.

II

The theories asserted by both the plaintiffs Wilson and Paty are very similar. Essentially, they both contend that the debtor, through the corporation, misapplied progress payments in violation of Tenn. Code Ann. § 66–11–138 (1982).[3] Since the use of such funds for other than payment of labor and material on the project for which they are intended is statutorily deemed prima facie evidence of intent to defraud, Tenn.Code Ann. § 66–11–140 (1982),[4] plaintiffs argue that the debtor,

mother to the corporation. Other similar payments were made earlier in January, March, and April, 1982. The debtor testified that notes were prepared for two of his mother's loans to the corporation. On July 22, 1982, the debtor's mother received a $9,000.00 check representing commission for work performed in regard to one of the projects.

3. This section provides:

*Misapplication of contract payments—Felony.*—Any contractor, subcontractor, or other person who, with intent to defraud, shall use

the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor performed on, or materials furnished by his order for, this specific improvement, while any amount for which he may be or become liable for such labor or materials remains unpaid, shall be guilty of a felony and punished accordingly.

4. This section provides:

*Unlawful use of funds as prima facie evidence of intent to defraud.*—Such use of the proceeds mentioned in §§ 66–11–137—66–11–

through the corporation, committed a felony constituting or equivalent to embezzlement. Thus, they contend that the misapplication of the funds constitutes a nondischargeable debt under 11 U.S.C.A. § 523(a)(4) (1979).[5]

Both the Wilsons and Paty also invoke 11 U.S.C.A. § 523(a)(2) (1979).[6] The Wilsons contend that their progress payments were obtained by fraudulent conduct as contemplated by this action. Similarly, Paty contends that materials charged by the debtor, through the corporation, were purchased with the fraudulent intent not to pay for the goods.

Asserting that the debtor exercised total dominion over the corporation to commit fraudulent acts, the plaintiffs further contend that the corporate fiction should be disregarded and that the debtor should be held personally liable.

The Wilsons also invoke 11 U.S.C.A. § 523(a)(6) (1979),[7] contending that the debtor willfully and maliciously converted the progress payments.

As a threshold matter, the debtor contends that the claim asserted by the Wilsons is not a claim for a valid debt assertable in bankruptcy; the debtor argues that the Wilsons' claim is essentially a claim for indemnity for payments which the Wilsons unnecessarily made in settlement of questionable lien claims. The debtor also maintains that the plaintiffs have failed to demonstrate the occurrence of actual fraud, false pretenses, or representations or to establish intent to defraud. The debtor denies the existence of a fiduciary relationship between the parties. Finally, the debtor contends that the progress payments to the corporation became property which the corporation was entitled to utilize in its commercial activities and were, therefore, not capable of being converted by the corporation.

### III

■ As a point of departure, the Wilsons' claim for reimbursement for payments paid in settlement of the lien claims may be properly asserted as a claim. The Bankruptcy Code defines "debt" as a "liability on a claim." 11 U.S.C.A. § 101(11) (1979). The Code further provides:

"claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . .

11 U.S.C.A. § 101(4) (1979).

Clearly, the broad parameters drawn by this language would encompass a claim such as that here presented by the Wilsons.[8]

139 for any purpose other than the payment of such unpaid amount shall be prima facie evidence of intent to defraud.

5. This section provides:

(a) A discharge . . . does not discharge an individual debtor from any debt—

.    .    .    .    .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

6. This section provides:

(a) A discharge . . . does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud,

. . . .

7. This section provides:

(a) A discharge . . . does not discharge an individual debtor from any debt—

.    .    .    .    .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

8. The debtor apparently contends that the plaintiff did not show that the liens were timely asserted, valid and enforceable. However, although the court was not presented with detailed documentation relating to each lien, the parties submitted a number of complaints alleging the filing of notices of lien within the 90-day period required by the state statute. Tenn.Code Ann. § 66–11–112 (1982). There was no evidence that any of the notices of lien were not filed within the requisite 90-day period. To the extent that the debtor is relying on Tenn.Code Ann. § 66–11–143 (1982) (requiring a lien claim-

■ Plaintiffs may not rely upon state law to establish a lesser standard than that established by federal law defining the degree of fraudulent conduct required for the applicability of 11 U.S.C.A. § 523(a)(2)(A) (1979). The question of the nondischargeability of a debt under this section is a federal question governed by federal law. *MacArthur Co. v. Crea (In re Crea)*, 31 B.R. 239 (Bankr.D.Minn.1983).

In *Crea* the court addressed in a similar context the applicability of a state criminal statute relating to contractors. The statute deemed guilty of theft any contractor who received payment for the improvement of real property but who failed to pay individuals providing labor or material for the improvement. Significantly, the statute lacked any requirement of intent to defraud. Examining the history and construction of § 17 of the Bankruptcy Act (the predecessor to 11 U.S.C.A. § 523), the court noted that prior to 1970 certain dischargeability questions were resolved in post-bankruptcy state court collection suits. However, in response to creditor abuse of the system Congress amended § 17, giving exclusive jurisdiction of these dischargeability issues to the bankruptcy courts. The aim of the amendments, the court noted, was to promote uniformity and federal control over the federally created right of discharge in bankruptcy. The same policies, said the court, justified the conclusion that federal law governs both the sub-

stance and procedure of such dischargeability determinations.[9]

Thus, finding the absence of the element of intent in the state statute to be in conflict with the federal standard, the court refused to hold the debt nondischargeable solely on the basis of a violation of the state statute. The court observed:

> Establishing a violation of § 514.02 [the state statute] alone would not be sufficient to find the debt nondischargeable. Dischargeability is a matter to be determined by federal law. Violation of a state statute is only persuasive where the state and federal standards are the same .... [H]olding a debt nondischargeable on the basis of a state law such as § 514.02 alone, absent any evidence that the defendant intended to defraud the creditor as required by § 523, contravenes the federal nature of bankruptcy and the bankruptcy courts exclusive jurisdiction over discharge. Such a holding would return this court to the position of a federal court interpreting state law. It would allow individual states to dictate the terms of dischargeability. If this were the case, the granting of discharge would be far from uniform. These are the problems the 1970 amendments were designed to eliminate.

*MacArthur Co. v. Crea*, 31 B.R. at 242–244.

Unlike the statute at issue in *Crea*, Tenn. Code Ann. § 66–11–138 (1982) specifically

---

ant to send written notice by certified or registered mail within 10 days after the filing of a notice of completion), the debtor is in error. This statute requires the written notice within 10 days only when the claimant has failed to otherwise file a notice of lien with the register of deeds. *Post-Tensioned Systems, Inc. v. Collins & Hobbs, Inc.* 640 S.W.2d 576 (Tenn.App.1982).

**9.** In *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the Supreme Court stated:

> By the express terms of the Constitution, bankruptcy law is federal law, U.S. Const., Art. I, § 8, cl. 4, and the Senate Report accom-

panying the amendment described the bankruptcy court's jurisdiction over these § 17 claims as "exclusive," S.Rep. No. 91–1173, p. 2 (1970).

*Brown v. Felsen*, 442 U.S. at 136, 99 S.Ct. at 2211.

Quoting further from the congressional reports, the Supreme Court said:

> "Since this is a Federal statute, the Federal courts necessarily have the final word as to the meaning of any terms contained therein." [citation omitted].

*Brown v. Felsen*, 442 U.S. at 136 n. 7, 99 S.Ct. at 2211 n. 7.

requires intent to defraud as an element of the offense. To this extent it does not conflict with the federal standard. However, Tenn.Code Ann. § 66–11–140 (1982) provides that the mere use alone of proceeds by a contractor for any purpose other than payment of labor and materials on the project constitutes prima facie evidence of intent to defraud. To the extent that this statutory presumption conflicts with federal law, it cannot be considered in the context of determining dischargeability.

■ Under established federal law, in order to except a debt from discharge under 11 U.S.C.A. § 523(a)(2)(A) (1979), a creditor has the burden of proving five elements: (1) a materially false representation (2) made with knowledge of its falsity and (3) with the intent to deceive, (4) reasonably relied upon by the creditor and (5) proximately resulting in the creditor's loss. *Heinold Commodities & Securities v. Hunt (In re Hunt)*, 30 B.R. 425 (Bankr.M. D.Tenn.1983).

■ Section 523(a)(2)(A) of the Bankruptcy Code was intended to codify the rule of *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1887), interpreting "fraud" to mean actual or positive fraud, involving moral turpitude or intentional wrong, rather than fraud implied in law. 124 Cong.Rec. 32399 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News pp. 5787, 6436, 6453 (statement of Rep. Edwards). Furthermore, "fraud must be affirmatively proven, not presumed. If there is room for an inference of honest intent, the question of fraud must be resolved in favor of the debtor." *Heinold Commodities & Securities v. Hunt*, 30 B.R. at 436. Plaintiffs may not rely upon the presumption set forth in Tenn.Code Ann. § 66–11–140 (1982) to substitute for the quantum and degree of proof required of plaintiffs under the federal standard.

■ The plaintiffs Wilson have failed to meet their burden of proving the elements necessary to establish that the progress payments were fraudulently obtained. In particular, the proof has failed to demonstrate either knowledge of falsity or intent to deceive on the debtor's part. The evidence did not establish that the debtor accepted the payments knowing either that he would not or could not fulfill his obligation to pay for the required materials and labor. Nor did the evidence show that the debtor intended to defraud or deceive the plaintiffs. At most, the proof showed the debtor to be guilty of very poor and careless business habits. He commingled his funds wholly without regard to their source and generally followed a haphazard procedure of paying heed to those creditors who were most vociferous in their demands for payment.

But this alone does not establish either the debtor's actual knowledge or reckless disregard of the fact that he would ultimately be unable to pay the subcontractors and suppliers. *See Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756 (9th Cir. 1981) (bankruptcy court not in error in finding that home owner failed to show that contractor who was experiencing difficulty paying creditors and who accepted progress payment either knew of or recklessly disregarded fact that he would be unable to perform his contract obligations). From all indications the debtor intended to pay the corporation's creditors and, indeed, believed himself capable of doing so until shortly before the irremediable extent of the corporation's financial predicament became clear. The debtor's conduct with regard to the Wilsons' progress payments was not fraudulent within the meaning of 11 U.S.C.A. § 523(a)(2)(A) (1979).

■ Nor has the plaintiff Paty established that the debtor fraudulently purchased materials on credit with either the intent not to pay for them or the knowledge that he would be unable to pay for them. This was not a situation involving, as in *Brad Ragan, Inc. v. Holcombe (In re Holcombe)*, 23 B.R. 590 (Bankr.E.D.Tenn. 1982), an abnormal or unprecedented purchase of goods virtually on the eve of bankruptcy. Nor was it, as in *First National Bank v. Banasiak (In re Banasiak)*, 8 B.R. 171 (Bankr.M.D.Fla.1981), a buying

spree clearly evidencing an awareness of inability to pay for the goods.

Here the debtor merely continued to make purchases in accordance with his previously well-established purchasing procedures. In addition, he continued to make payments on the account, paying approximately $24,000.00 in the last two months of the corporation's operations. In *Sears, Roebuck & Co. v. Wood (In re Wood)*, 571 F.2d 284 (5th Cir.1978), the court found no fraudulent intent where the debtor had merely purchased goods through the ordinary use of his charge account, had not incurred the charges in anticipation of bankruptcy, and had generally met his debts as due until confronted with unanticipated financial difficulties. Similarly, the facts in the instant case do not establish fraudulent conduct within the meaning of 11 U.S.C.A. § 523(a)(2)(A) (1979).

■ The plaintiffs may not rely upon 11 U.S.C.A. § 523(a)(4) (1979)[10] in this context. First, the debtor's conduct did not constitute fraud or defalcation while acting in a fiduciary capacity. Tenn.Code Ann. § 66–11–138 (1982) is not an explicit state builders trust fund statute; rather, it is merely a statute making the misapplication of construction funds a criminal offense. Were any trust deemed created under the statute, such a trust would clearly be only a trust *ex maleficio*, arising only upon occurrence of the unlawful act of misapplication. This statute does not create an express or technical trust necessary to establish a fiduciary relationship within the contemplation of 11 U.S.C.A. § 523(a)(4) (1979). *Wilson v. Estes (In re Wilson)*, 30 B.R. 91 (Bankr.E.D.Tenn.1983); *Kannon v. Blalock (In re Blalock)*, 15 B.R. 33 (Bankr. E.D.Tenn.1981); *Witt Bldg. Material Co. v. Barker (In re Barker)*, 14 B.R. 852 (Bankr.E.D.Tenn.1981). *See also Sequat-*

*chie Concrete Service v. Cutter Laboratories*, 616 S.W.2d 162 (Tenn.App.1980).

■ The plaintiffs contend, however, that the debtor misapplied proceeds in violation of Tenn.Code Ann. § 66–11–138 (1982) and that a violation of that statute constitutes "embezzlement" within the meaning of 11 U.S.C.A. § 523(a)(4) (1979). As previously noted, Tenn.Code Ann. § 66–11–138 (1982) enumerates "intent to defraud" as a specific element of the offense. Having found that the proof has failed to demonstrate intent to defraud on the debtor's part, the court need not decide whether a violation of this statute, if proven, would come within the meaning of "embezzlement" as contemplated by 11 U.S.C.A. § 523(a)(4) (1979).[11] Under these facts there has been no satisfactory showing of the essential element of intent to defraud.

■ The plaintiffs Wilson contend that the debtor willfully and maliciously injured property of the plaintiffs within the meaning of 11 U.S.C.A. § 523(a)(6)[12] by committing conversion of the progress payments. Plaintiffs are however, mistaken in this contention.

This court need not decide whether the Wilsons, upon payment of the proceeds to the debtor, retained a property interest capable of being converted by the debtor. *See generally Langdon v. Alexander (In re Alexander)*, 19 B.R. 149 (Bankr.D.Or. 1981) (property owners who made down payment to contractor for remodeling work lacked property interest in funds subject to conversion where statute neither restricted contractor's use of funds nor reserved to property owners any rights to funds).

Here, even assuming *arguendo* that the debtor converted property of the Wilsons, the debtor's actions would, nonetheless, not amount to both a willful and malicious con-

---

**10.** See note 6, *supra.*

**11.** *See generally Great American Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761 (Bankr.E.D. N.C.1983) ("larceny" in context of dischargeability determination means common law larceny and state statute designating insurance agent's failure to account for premium as "larceny" is not determinative). *But see Lumbermens Mutu-*

*al Casualty Co. v. Snellgrove (In re Snellgrove)*, 15 B.R. 149 (Bankr.S.D.Fla.1981) (contractor's diversion of construction funds, constituting embezzlement under state statute, held nondischargeable).

**12.** See note 8, *supra.*

version. The term "willful" requires intentional and deliberate action. H.R.Rep. No. 595, 95th Cong., 1st Sess. 365, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320; *Ford Motor Credit Co. v. Klix (In re Klix)*, 23 B.R. 187 (Bankr.E.D.Mich.1982). Clearly, the debtor's misapplication of the funds may be said to have been "willful": he deliberately and intentionally applied the funds to uses other than the payment for labor and materials furnished on the Wilsons' building.

However, the debtor's actions were not "malicious" within the meaning of 11 U.S. C.A. § 523(a)(6) (1979). The courts have taken at least two approaches in defining the term under the Bankruptcy Code. One line of authorities requires an actual, conscious intent to financially injure the creditor. *United States v. Langer (In re Langer)*, 12 B.R. 957 (D.N.D.1981) (debtor's sale of grain with knowledge of creditor's security interest in crop was not malicious where debtor had no intent to financially harm creditor); *Grand Piano & Furniture Co. v. Hodges (In re Hodges)*, 4 B.R. 513 (Bankr.W.D.Va.1980) (debtor's sale of stereo in which creditor had security interest not malicious where debtor did not intend to harm creditor).

A second line of authorities has adopted a less stringent standard of implied or constructive malice. *Wis. Finance Corp. v. Ries (In re Ries)*, 22 B.R. 343 (Bankr.W.D. Wis.1982) (debtor's sale of collateral malicious where debtors knew they would be harming secured creditor by sale); *Farmers Bank v. McCloud (In re McCloud)*, 7 B.R. 819, 825–26 (Bankr.M.D.Tenn.1980) ("If an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion even though there be an absence of special malice.") These cases require essentially that the debtor know that his act will harm another and that he proceed in the face of that knowledge. *Klix*, 23 B.R. at 190.

However, as the court in *Ries* made clear:

It appears that there must actually be knowledge; a finding that the debtors should have known that harm would result will not suffice.

*Ries*, 22 B.R. at 347.

Although a debtor's knowledge can be inferred from the circumstances, *Id.*, in the instant case the court is not persuaded that the debtor knew financial harm would necessarily result to plaintiffs from his commingling of the funds. His procedure was the same as it had been since the commencement of the business—he put all of his receipts in a common account and paid creditors on a staggered basis, largely dependent on which creditor made the loudest demand for payment. The debtor clearly intended to pay the subcontractors and suppliers; although the amount is indeterminable, he unquestionably applied a portion of the funds to payment for labor and materials furnished on the plaintiffs' project. The debtor, perhaps, did not have a realistic conception of the enterprise's close proximity to financial disaster. Perhaps he should have known that applying the proceeds as he did would result in financial harm to plaintiffs. But it has not been established, and cannot be inferred from the circumstances, that he knew that commingling the proceeds and applying them as he did would cause financial harm to plaintiffs nor that he proceeded in the face of such knowledge. The debtor's actions with respect to the funds cannot be deemed "malicious" within the meaning of 11 U.S. C.A. § 523(a)(6) (1979).

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.