**HAYES PIPE SUPPLY, INC.,**
**Plaintiff/Appellee,**

v.

**McKENDREE MANOR, INC.,**
**Defendant/Appellant.**

Supreme Court of Tennessee,
at Nashville.

Aug. 5, 1985.

David S. Zinn, Nashville, for plaintiff/appellee.

Hunter Short, Nashville, for amicus curiae R.P. Industries, Inc.

M. Edward Owens, Jr., Nashville (Chambers, Wyckoff & Beckner, Nashville, of counsel), for defendant/appellant.

## OPINION

HARBISON, Justice.

Appellee sought to enforce a furnishers' lien upon real property owned by appellant. Appellant had fully paid a contractor for the work performed upon its property, and the contractor had from time to time made payments to appellee, its supplier. Appellee had never credited any of these payments to the account which the contractor had established with it for this particular job. Instead all payments had by agreement between the contractor and appellee been credited to other accounts.

The Chancellor found that the allocation of payments had been made for the benefit of the supplier and the contractor to the detriment of the property owner. Under all of the circumstances he held that the appellee was precluded from enforcing its lien. The Court of Appeals reversed and ordered the lien enforced, holding that the record failed to show that appellee had actual knowledge of the source of payments or that it could reasonably be charged with such notice.

We are of the opinion that the evidence preponderates in favor of the conclusions reached by the Chancellor. Accordingly we reverse the judgment of the Court of Appeals and dismiss the action.

There is little dispute as to the material facts. Prior to May 20, 1981, Ring Contractors, Inc. had for several years been engaged in the construction of underground utilities. Appellee, Hayes Pipe Supply, Inc., was a supplier of pipes and related materials for such utilities. It had done business with Ring for several years, and on May 20, 1981, Ring was indebted to it in the amount of $119,227.49, over half of which was for invoices more than 120 days old. Ring's account was described by the bookkeeper of Hayes as being in "serious difficulty" by June, 1981.

On May 20, 1981, appellant, a church-affiliated convalescent and retirement center, contracted with Ring Contractors, Inc., for the installation of roads, water and sewer lines in the amount of $136,000. The water and sewer lines were to be constructed and paid for in two stages, and the paving work, which Ring subsequently subcon-

tracted to another company, was to be completed in a third stage.

Although Ring was substantially indebted to it, Hayes agreed to furnish materials to Ring for the McKendree Manor job. Between June and October, 1981, Ring purchased materials and supplies from appellee in the amount of $30,753.71, to collect which appellee has sought to establish and enforce a lien against the McKendree Manor property.

Work on the project progressed steadily. Most of the materials and supplies utilized by Ring on the job were purchased from appellee during June and July 1981. The water and sewer portions of the contract had been completed by October 1981. On October 30, 1981, the contractor furnished the landowner a written affidavit that all materials previously used on the job had been paid for. The contractor had been paid by the owner pursuant to periodic requests submitted to the owner, and by October 30 the contractor had been paid over $99,000. The balance was paid to him during the summer of 1982 after the paving work was completed. At no time did the owner receive any indication either from the contractor or the supplier that the latter had not been paid for materials and supplies furnished to the contractor. On the contrary, the contractor gave several verbal assurances to the landowner that such payments had been made in full, in addition to giving a written affidavit on October 30, 1981. At no time did the supplier ever contact the owner, verbally or in writing, or give the owner any indication that its invoices, issued from June to October, 1981, had not been paid. Not until nearly ninety days after final completion of the paving in 1982 did the owner receive notice of any claim for outstanding and unpaid invoices by the supplier.[1]

Although appellee's chief executive officer, Mr. William Hayes, Jr., testified that he always believed that Ring Contractors, Inc., was solvent, from the outset of the job involved here appellee was fully aware that the contractor was operating on credit which was becoming increasingly insecure. As stated previously, the contractor was heavily indebted to the supplier for materials furnished on previous jobs when it entered into the contract with McKendree Manor. Mr. Hayes testified that several other contractors were similarly operating on credit extended by his company. From time to time the total amount of credit extended by Hayes Pipe Supply, Inc., to its contractors ran into the hundreds of thousands of dollars, even as high as two million dollars. Hayes Pipe Supply, Inc., invoices called for payment in thirty days, but these terms were seldom enforced. Instead the supplier added late charges to its invoices and, in effect, partially financed the operations of its customers, including Ring.

In order to do so, it was necessary for Hayes Pipe Supply, Inc., to factor its accounts receivable with a firm in Atlanta, Georgia. The factor would only accept accounts less than 120 days old. Accordingly appellee agreed with Ring, and probably with other contractors, to apply all payments made to appellee to the oldest outstanding accounts, unless otherwise specially designated. Ring at no time designated any of its payments to be applied to any of its particular jobs, so that all payments made by Ring to Hayes were applied to the oldest outstanding invoices on the books of the supplier.

In addition, Hayes actively monitered the accounts receivable of its customers, including Ring. Mr. Hayes testified that he conferred at least monthly, and sometimes more frequently, with Mr. John Ring, president of the contractor, and was regularly kept advised by Ring of the amounts due to Ring from customers on various jobs which Ring was performing. During 1981 Ring had at least nine jobs in process on which Hayes furnished materials and supplies. Ring made periodic payments to Hayes

---

1. Ring's equipment was repossessed by other creditors in August 1982, and in September the company filed a petition in bankruptcy.

during 1981, but in no instance was there any specific designation or instruction given for application of payments to particular invoices or jobs. Instead, by agreement of the contractor and the supplier, all payments were applied against the oldest outstanding and unpaid invoices. This method of operation was established by them for their mutual benefit. Hayes was concerned with the aging of its accounts and with being able to factor those which were most recent.

It is not contended by appellee that the landowner had any knowledge of the agreement between it and Ring to apply all payments, regardless of their source, to the oldest accounts of Ring. There is evidence that had the landowner been advised of this method of operation, it would have insisted upon application of its payments to the account carried for its job. Appellee invoiced shipments of material to particular jobs, including that of appellant, and kept its records so that at all times it knew the amount which it had outstanding against each project of Ring. It could easily have applied payments according to their source had either it or Ring desired to do so.

Neither Ring nor appellee gave any particular thought to the terms and provisions of the Tennessee mechanics' lien statutes throughout the period involved here. There was no attempt made to correlate payments to particular projects, or to allocate payments to their source. Appellee deemed itself quite insecure, however, by the early fall of 1981. At that time it required Mr. Ring to obtain and assign to it a policy of life insurance. It also required him to sign a promissory note on October 23, 1981 for the outstanding balance of all his company's accounts, totaling $117,077.22. This was almost as much as Ring had owed to Hayes in May, 1981 when Ring entered into the McKendree Manor contract. Between June 18, 1981 and October 30, 1981, however, Ring had made total payments to Hayes of $106,319.73. None of this amount had been credited to the McKendree Manor account, although during that period of time, as previously stated, McKendree had paid to Ring nearly $100,000.

There is no evidence as to Ring's costs and expenditures on the McKendree Manor job, other than his account with appellee. There is no indication that he applied or expended the entire amount received from appellant on other costs and expenses of this particular job.

Appellee so closely monitored the financial situation of Ring that it required him to execute and deliver checks in varying amounts to be deposited and cleared when Ring had sufficient funds to cover them. These checks were in the amounts of invoices outstanding on other jobs. During the summer of 1981 a number of these checks were authorized by Ring to be deposited and collected by appellee. Appellant was not directly able to trace the funds which it paid to Ring, but coincidentally with its making several payments to Ring, Ring authorized appellee to deposit and collect several outstanding pre-dated checks which Ring had given to appellee. In some instances the correlation between these events was quite close. For example on July 2, 1981, Ring received $64,800 from McKendree. On that date he authorized Hayes to cash and clear $28,000 of checks which Ring had previously given to Hayes. These checks represented the amounts of invoices owing from Ring to Hayes on other jobs.

On July 30, 1981, Ring received $35,100 from McKendree and on the same date cleared $25,000 in previous checks for deposit and collection by Hayes.

It is, of course, possible, as suggested by the Court of Appeals, that the sources of funds to pay these previously outstanding checks to Hayes came from other jobs. There is no testimony to that effect, however, either from Ring or from Hayes. Certainly a trier of fact could reasonably deduce from the evidence that funds from the McKendree Manor job were being channeled to Hayes for the payment of invoices on other jobs pursuant to the prior agreement between those parties.

By November 1981, in addition to requiring execution of a note and assignment of life insurance, Hayes required Ring to execute another series of pre-dated checks, each in the amount of an outstanding invoice owed to Hayes, including checks for the amounts claimed by Hayes to be owing on the McKendree Manor job. This was done after Ring had already given an affidavit to McKendree that all previous outstanding job expenses had been paid and without any communication whatever from Hayes to McKendree that Hayes was claiming any balance due, even though by that time its June invoices were nearly five months old. Mr. Ring testified that he considered the giving of his note, assignment of life insurance and the execution of these checks as "payment" of the Hayes invoices, so that he felt that he could, in good conscience, represent to McKendree by his affidavit of October 30 that all expenses on the job to date had been paid.

This course of conduct on the part of Ring constituted, very nearly if not actually, a major criminal offense. It is made a felony by T.C.A. Sec. 66–11–138 for any contractor or other person, with intent to defraud, to use the proceeds of any payment made to him for improving real estate

"... for any other purpose than to pay for labor performed on, or materials furnished by his order, for, this specific improvement, while any amount for which he may be or become liable for such labor or materials remains unpaid...."

The following Code section, T.C.A. Sec. 66–11–139, deprives any lienor of his claim if the court finds that the lineor has willfully or grossly exaggerated the amount for which he claims a lien.

T.C.A. Sec. 66–11–140 provides that the use of the proceeds of payment "for any purpose other than the payment of such unpaid accounts shall be prima facia evidence of intent to defraud."

■ Pursuant to these statutes, it has long been the rule in this state that any furnisher of materials and supplies to a contractor must act in good faith. If he falsifies his account or connives with a contractor to defraud the owner, he loses his right to enforce a lien. *Pidgeon-Thomas Iron Co. v. McKnight*, 8 Tenn.Civ.App. (8 Higgins) 1 (1918).

■ While both the trial court and the Court of Appeals have found that Hayes did not act in actual bad faith or with intent to defraud McKendree, it certainly was acting very closely with the contractor to divert funds from particular jobs and to apply them to older invoices, on jobs to which the payments had no correlation, for the mutual benefit both of itself and of Ring. Under these circumstances, it is our opinion that Hayes has come very close to colluding with Ring in the commission of a serious criminal offense. Its conduct, in our opinion, is such that a court of equity should preclude it from successfully enforcing a furnisher's lien on the property of the landowner.

■ It has long been the rule in this state that a court of equity may allocate, or reallocate, payments for the purposes of achieving equity and a result consonant with good conscience. For many years it has been the rule in this state that if the supplier has actual knowledge of the source of payments, it must apply the payments so as to protect that source from exposure to a lien. It is also the rule that even if the supplier does not have actual knowledge, it may be required so to allocate payments if it has knowledge of facts from which it reasonably should know of the source. *See Bain-Nicodemus, Inc. v. Bethay*, 40 Tenn.App. 487, 292 S.W.2d 234 (1953). This rule is an exception to the general rule that the right of appropriation of payments belongs exclusively to the debtor and creditor and that third persons may not control or compel appropriations different from those agreed upon by them.

■ The arrangement between Hayes and Ring may have been appropriate as between them, but when the rights of innocent third parties—landowners making payments to Ring—become involved, and when Hayes seeks to enforce a mechanics' lien

on the property of such landowners, then an entirely different situation is presented.

The Court of Appeals noted that in some states when payments are made to a contractor by a landowner, the money becomes that of the contractor and he is thereafter free to apply it as he sees fit.[2] Noting that such states impose very little duty upon the contractor, the Court of Appeals said:

"If the contractor has no duty to apply the money received from the owner to the account with the supplier in the owner's name, it follows that the supplier has no greater duty to apply the funds properly."

While this may be the rule in some jurisdictions, it has no application under Tennessee statutes. As stated previously, a contractor receiving payments from a landowner in this state is under a very strict statutory duty to apply those payments properly and not to divert them so as to leave the landowner exposed to the possibility of a lien.

In one of the first cases construing the statute, T.C.A. Sec. 66–11–138, this Court sustained the constitutionality of the legislation and held that the diversion of funds by a contractor "makes him guilty of a felony irrespective of the amount so misappropriated." *State v. Overton*, 193 Tenn. 171, 175, 245 S.W.2d 188, 190 (1951).

Speaking of the purposes of the Tennessee statutes imposing such strict duties upon contractors, the Court said:

"To us it seems that there is no ambiguity in the statute and that a statute of the kind is a very salutory piece of legislation. It is common knowledge to all lawyers that over a period of years and especially during a building boom, there are hardly enough precautions that can be taken by the lender of money or the property owner to protect himself against improper application of funds

paid in certain instances to certain unscrupulous contractors *or those doing business on a shoe string*. It was probably by reason of this fact that the present statute was adopted by the legislature at the instance of the reputable contractors and others of the State." 193 Tenn. at 179–180, 245 S.W.2d at 191. (Emphasis added).

The statute was further considered in the case of *Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739 (1965), *appeal dismissed*, 384 U.S. 435, 86 S.Ct. 1601, 16 L.Ed.2d 671 (1966). There the Court said:

"Under this statute it is a criminal offense for a contractor to retain or appropriate to his own use payments made to him on a contract for realty improvement without paying the amounts due for labor and materials which may become a lien on the realty. A statute of this nature is intended to make the payments to the contractor trust funds for the payment of labor and materials, and to afford protection against contractors who receive money for construction or repair of buildings and divert it to other uses prior to payment of claims for labor, materials, or other charges in connection with the work on the building. The legislative purpose is to punish for a fraudulent conversion and not for failure to comply with the contractual obligation. The essential elements for the commission of the offense are the payment of the money to a contractor by the owner for the construction of a building and a diversion of the money to other purposes by the contractor prior to the payment of all claims for which the money constitutes a trust fund." 216 Tenn. at 671–672, 393 S.W.2d at 741.

Both Mr. Ring and Mr. Hayes either knew or were chargeable with knowledge of these statutes. The plan or agreement which they entered into for the deliberate

**2.** The Court of Appeals cited for this proposition the case of *Jefferson v. Church of St. Matthew*, 41 Minn. 392, 43 N.W. 74, 75 (1889). Later statutes in Minnesota, however, as construed by the courts of that state, cast doubt upon this decision. *See* Minn.Stats.Ann. § 514.02 (1985 Supp.); *State v. Reps*, 302 Minn. 38, 223 N.W.2d 780, 78 A.L.R.3d 548 (1975) (payments from landowner to contractor are received "in trust" under a "fiduciary duty" to apply them properly).

diversion of funds received by Ring to its older invoices, regardless of the source of payment, simply cannot be upheld as against innocent property owners. Both courts below have found as a fact that Hayes knew that Ring was receiving substantial periodic payments from McKendree Manor. These findings are supported by the great weight of the evidence. Hayes may not have known the specific amount of each draw, but it did know that funds from McKendree were being paid to Ring during the summer of 1981. It also knew that its invoices on the McKendree Manor job were not being credited, but this was by the deliberate choice and agreement of the contractor and the supplier, contrary to the requirements of the statutes mentioned above.

The Court of Appeals was of the opinion that the principles of the *Bain-Nicodemus* case, *supra,* could be applied only if the supplier had actual, or "positive," knowledge of the source of payments. We do not so construe that decision. There the court found that the contractor had not in fact instructed the supplier as to the source, so that there was no actual knowledge. Nevertheless the books and records of the contractor, which were analyzed in the opinion, were such that the appellate court found that the supplier was charged with knowledge. The "positive knowledge," which the court found, was based upon the books and records of the parties and all of the circumstances of the case, and not upon any actual, direct instructions or information conveyed to the supplier as to the proper allocation of the payment. There is no conflict between this case and the earlier case of *Butler v. Heidel,* 3 Tenn.Civ.App. (3 Higgins) 542, 549 (1912), where the court held that the duty to credit the particular account of a third party "applies where the materialman or mechanic knows the source from which the money comes or is in possession of such facts as reasonably imputes (*sic*) notice to him of the source."

■ It is our opinion that Hayes was chargeable with knowledge of the source or sources of the funds of the contractor in this case, particularly in view of the unusually close monitoring and inspection of the contractor's books and records shown by the evidence. There probably are many instances in which a supplier could not reasonably be expected to know the source of payments, but this is not such a case.

The Chancellor said:

"The only reason McKendree Manor was not credited was because of the plaintiff's desire to protect its relationship with its factor by applying the payments to the open accounts ...

"The plaintiff knew that Ring was receiving periodic payments from McKendree Manor. It is true that Mr. Hayes didn't know the exact details of it, but he testified that he was aware that periodic payments were being made, probably he thought on a monthly basis, yet rather than crediting McKendree Manor or the McKendree Manor job, the plaintiff credited the payments to the open account and did so because it would help its relationship with its factor. The plaintiff felt that it was in its best interest to try to keep its accounts under 120 days."

The preponderance of the evidence clearly supports these findings of the Chancellor, and we agree with his conclusions that under these circumstances a court of equity should not permit the enforcement of a lien against the landowner. It is true, as pointed out by appellee, that the landowner could have taken certain precautions to assure that its payments were being properly credited, either by requiring a performance bond from the contractor or by making inquiry of the supplier. On the other hand, the supplier was actively monitoring the books and records of the contractor, and as between the landowner and the supplier in this case, we find that the equities greatly preponderate in favor of the landowner.

We do not find it necessary to lay down any new principles of law or to impose new duties upon suppliers as suggested by the appellant. Under the facts of this case we are of the opinion that a court of equity clearly had the authority to order realloca-

tion of the payments according to their source, and thereby to protect the landowner from the claimed lien. Whether this be accomplished by a theory of estoppel, as suggested by the Chancellor, by waiver or simply by the general authority of a court of equity, the result is the same.

The judgment of the Court of Appeals is reversed. The judgment of the trial court is reinstated. All costs are taxed to appellee. The cause will be remanded to the trial court for collection of costs accrued there and for any other orders which may be necessary.

COOPER, C.J., and FONES, BROCK and DROWOTA, JJ., concur.