See also, Bkrtcy., 64 B.R. 843.

**In re Joseph Michael WHITE, d.b.a. Kalthoff Heating & Cooling and Evaline White, Debtors.**

**BURLESON CONSTRUCTION COMPANY, Plaintiff,**

**v.**

**Joseph Michael WHITE, d.b.a. Kalthoff Heating & Cooling and Evaline White, Defendants.**

**Bankruptcy No. 3–85–00367. Adv. No. 3–85–1051.**

United States Bankruptcy Court, E.D. Tennessee.

Aug. 28, 1989.

Richard J. Barefield, for plaintiff.

John H. Fowler, for defendants.

MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This case is before the court upon the plaintiff's dischargeability complaint alleging nondischargeability of debts pursuant to the provisions of 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). At the conclusion of plaintiff's proof, defendant Evaline White was dismissed from this action. The court now enters its findings of fact and conclusions of law with respect to the remaining defendant Joseph Michael White.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(I) (West Supp.1989).

*Findings of Fact*

1. Plaintiff Burleson Construction Company (hereinafter "Burleson") is a Tennessee corporation and was the general contractor on a construction project known as the "Oak Square Project" in Gatlinburg, Sevier County, Tennessee.

2. At all relevant times herein, defendant Joseph Michael White (hereinafter "White") owned Kalthoff Heating and Cooling (hereinafter "Kalthoff"), a distributor and installer of heating and air conditioning units. Originally Kalthoff was a Tennessee general partnership with two partners—White and Sid Harrell. On October 5, 1984, White purchased Harrell's interest in the business and thereafter operated the business as a sole proprietorship.

3. Barry Davis is an accountant who had been hired by Kalthoff to perform the company bookkeeping functions including the payment of payroll and office expenses. Davis had general authority to write checks on the business's account and to pay invoices received from vendors and suppliers.

4. White had little to do with Kalthoff's financial affairs during the time Davis was with the business. White spent most of his time outside the office arranging sales and supervising the business's projects. Davis never discussed with White the complete financial condition of the business during the time Davis handled the bookkeeping functions. From its inception, the business experienced cash flow problems.

5. Kalthoff maintained one operating account from which its expenses were paid. When Kalthoff received payments from contractors on specific projects, the funds were always deposited in the general operating account. No effort was ever made to segregate the funds or to apply the funds only to a specific project. All funds deposited into the general operating account were available to pay the payroll, payroll taxes, utilities, and business expenses of Kalthoff.

6. One of Kalthoff's major suppliers was Andrews Distributing Company (hereinafter "Andrews"). That company supplied Kalthoff with HVAC (heating and cooling) units for jobs subcontracted by Kalthoff. Davis had early on received instructions from White to keep the Andrews' account current.

7. On October 17, 1984, Burleson entered into a written subcontract with Kalthoff. This contract generally provided that Kalthoff would furnish and install a quantity of HVAC units on the Oak Square project for a contract price of $97,643. The supplier of the HVAC units to Kalthoff was Andrews.

8. The subcontract was modified in November 1984 to provide for a different set of HVAC units and the contract price was increased to $124,000. This modified contract price included a restocking fee of $4,000 which Kalthoff was to pay to Andrews for return of the units already delivered to Kalthoff business premises.

9. The HVAC units required under the modified contract were purchased from Andrews and were delivered to Kalthoff's Knoxville business premises on the afternoon of December 21, 1984.

10. On December 24, 1984, Kalthoff invoiced Burleson for the sum of $103,493 which represented the cost and delivery of the HVAC units.

11. On January 10, 1985, Burleson issued a check in the amount of $93,143.70 which paid the invoice issued by Kalthoff on December 24, 1984, less ten percent retainage as required by the subcontract. Prior to receiving the check, White told

Reno Burleson, president of Burleson, he wanted the check so he could promptly pay Andrews for the HVAC units in order to take advantage of a discount allowed by Andrews for early payment.

12. Upon receiving the check on January 10, 1985, White executed a waiver of lien form provided to him by Burleson. That form reads in relevant part as follows:

NOW, THEREFORE, for an in consideration of the sum of $93,143.70 (Ninety Three Thousand One Hundred Fourty (sic) Three Dollars and Seventy Cents) paid by Burleson Construction Co., Inc. and other good and valuable considerations, the receipt whereof is hereby acknowledged, the undersigned does hereby waive and release any and all lien and claim or right to lien on said above described building(s) and real estate under the statutes of the state in which the property is located relating to mechanics' liens and materialmen's liens by reason or on account of labor or materials, or both, whether fully described and identified herein or not, and heretofore furnished by the undersigned for the said building(s) and real estate; it being the express intention of the undersigned, with full knowledge of the provisions of his (its) rights, that acceptance of the above amount is acknowledgment of satisfaction and payment in full, and the execution hereof constitutes a full and complete discharge, release and waiver of his (its) mechanics' lien and materialmen's lien for any and all work and labor done and performed or any and all materials or both, furnished to date.

The undersigned hereby certifies that all labor and/or materials furnished or used on the above described premises for which this waiver of lien is executed have been paid in full.

13. Although the waiver of lien form specifies that all materials furnished for the job had been paid in full, Reno Burleson knew Andrews had not yet been paid by Kalthoff. Burleson assumed White would pay Andrews immediately. White, however, never told Burleson when Andrews would actually be paid.

14. The evidence did not clearly establish when the Andrews' invoice was due, whether in late January 1985 or in February 1985.

15. The check for $93,143.70 was given by White to Davis for deposit into Kalthoff's general operating account in accordance with past practice. At the time he gave the check to Davis, White gave no special instructions to Davis concerning the check.

16. According to Davis's testimony, sometime after the Burleson check was received and deposited, an employee at Kalthoff prepared a list of accounts payable then due and owing for January. Davis testified he briefly discussed this list with White who instructed him what accounts to pay. Davis recalls that White told him he could use $70,000 from the proceeds of the Burleson check to pay a number of accounts payable and other business expenses. Davis then applied $70,000 from the check proceeds to accounts payable other than the Andrews' account; an amount totaling $20,447.33 from the check proceeds was paid to Andrews.

17. White denied he instructed Davis to pay other accounts with the check proceeds. White testified that when he discovered Andrews had not been paid for the units, he also discovered a number of other delinquent accounts of which he was unaware. He then fired Davis in approximately February 1985.

18. Davis was somewhat tentative and unsure about his conversations with White. Davis first testified "nothing was ever said about this particular [the Burleson] check." When confronted with his pretrial deposition, Davis testified he and White did discuss payment of particular accounts with proceeds from the Burleson check. In the same deposition, however, Davis stated his action in paying other accounts with the Burleson check proceeds could have resulted from a possible misunderstanding between him and White. Davis also testified he had no reason to believe White did not intend to pay Andrews.

19. The court cannot accept Davis's testimony as clear and convincing evidence

that White intended to defraud Burleson at the time White obtained the $93,143.70 check from Burleson. First, the tentativeness displayed by Davis during his testimony precludes a finding that Davis's recollection of the events surrounding the disbursement of the Burleson check proceeds is entirely accurate. Secondly, aside from the equivocable nature of Davis's testimony, the preparation of the payables list due in January and the purported conversation between Davis and White concerning payment of other payables with the check proceeds appears to have occurred after the Burleson check had been received and deposited in Kalthoff's general operating account. Thus, even accepting Davis's testimony as an accurate account of events, the testimony does not establish that at the time White obtained the Burleson check it was his intent to divert the proceeds to other accounts leaving the Andrews' account unpaid. If White formed an intent to use the Burleson check proceeds to pay other accounts to the exclusion of the Andrews' account, that intent could have just as easily arisen after the Burleson check had been received and deposited and an accounts payable list of accounts due in January had been presented to White. Consequently, the court finds the evidence failed to establish White intended to defraud Burleson at the time White obtained the $93,143.70 check from Burleson.

20. Davis was terminated by White in February 1985. At least by that time, White knew Andrews had not been paid for the HVAC units.

21. On March 1, 1984, Kalthoff delivered the HVAC units to the Oak Square project in Gatlinburg, Tennessee. White requested that Burleson pay the remainder due on the retainage plus the $4,000 restocking fee owed to Andrews. Before Burleson would issue the check, White was again required to sign a waiver of lien form. The second waiver of lien form signed by White contained the same language quoted previously herein. White executed the waiver of lien form and delivered it to Grover Burleson, secretary of Burleson Construction Company. Relying upon the representation that the materials furnished for the job had been paid in full, Grover Burleson delivered a check in the amount of $14,349.30 to White representing the balance due on the Kalthoff invoice to Burleson plus the restocking fee.

22. The check of March 1, 1985, was deposited into the general operating account of Kalthoff and was distributed to various creditors, but none to Andrews. At the time he obtained the $14,349.30 from Burleson, White had no intention of applying those funds to the Andrews' account.

23. To the extent White testified he was not cognizant of the meaning or significance of the waiver of lien form, the court finds such testimony not credible. White's experience as a subcontractor belies the notion that he was not generally familiar with mechanics' lien laws and their role in the construction industry.

24. The waiver of lien form not only states that the subcontractor acknowledges payment in full for all materials and labor furnished by the subcontractor, but it also makes a wholly separate representation that all materials furnished for the job have been paid in full. This second representation is particularly significant to contractors who can be held liable to those unpaid vendors of subcontractors who furnish materials to subcontractors for installation into a construction project.

25. White testified he could not remember whether he had actually read the waiver of lien form before he signed it. Yet, the form contains certain representations and certifications White acknowledged by his signature on the form. The one-page form was short and could be read in a minute or two, the print on the form was normal typewriter-sized print and was not difficult to read, and the form's importance was emphasized both by the preface above the signature line which read: "Given under my (our) hand(s), this 1st day of March, 1985 in the County of Sevier, State of Tennessee" and by the inclusion of a signature line for a witness. If White did not read such a form before signing it, he acted in

reckless disregard as to the truth of the representations contained in the form.

26. Because White knew Andrews had not been paid for the units at the time he executed the waiver of lien form which represented that all materials furnished for the job had been paid in full, and because White either knew he was making a false representation to Burleson that all materials had been paid, or he acted with gross recklessness as to the truth of the representation, White obtained the $14,349.30 check from Burleson by a false representation with intent to deceive.

27. Burleson would not have issued the $14,349.36 check to White had it known Andrews had not been paid for the units.

28. Burleson reasonably relied on White's representation that the materials furnished for the job had been paid in full since the check for $14,349.30 represented only a $4,000 restocking fee and a ten percent retainage on Kalthoff's invoice to Burleson which would have included profit, overhead, and delivery costs.

29. On March 18, 1985, White and his wife, Evaline White, filed a voluntary petition in bankruptcy under the provisions of chapter 7.

30. On April 10, 1985, Burleson and Electric Service Company of Knoxville entered into a written subcontract agreement for the installation of the HVAC units by Electric Service in the Oak Square project for the sum of $17,255.

31. The Oak Square project is now complete.

32. In a state court lawsuit, Burleson was ultimately held liable to Andrews for the cost of the units in the approximate amount of $70,000. Burleson's reliance on White's representation that all the materials for the job had been paid for was a proximate cause of Burleson's loss represented by the judgment obtained against it by Andrews.

### Conclusions of Law

The plaintiff relies upon § 523(a)(2)(A) and 523(a)(4) in seeking an order declaring its claim against Joseph White nondis-

chargeable. Section 523(a)(2)(A) reads in relevant part:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> ....
>
> (2) for money ... to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C.A. § 523(a)(2)(A) (West Supp. 1989).

■ A creditor seeking to except a debt from discharge under § 523(a)(2)(A) must prove (1) the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor acted with intent to deceive; (3) the creditor reasonably relied upon the false representation; and (4) the creditor's reliance was the proximate cause of the loss. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986). Moreover, the creditor must establish the elements of § 523(a)(2)(A) by clear and convincing evidence. *Id.* at 932.

■ Intent to deceive may be inferred in instances in which the debtor acts with gross recklessness as to the truth of the representations being made. *See Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir.1986); *Coman v. Phillips (In re Phillips)*, 804 F.2d at 934; *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985). Such gross recklessness may be present where a debtor certifies a statement by his or her signature, only to claim later that he or she never read the statement. *See Long Island Trust Co. v. Rodriguez (In re Rodriguez)*, 29 B.R. 537, 541 (Bankr.E.D.N.Y.1983); *Teachers Serv. Org. v. Anderson (In re Anderson)*, 10 B.R. 607, 608 (Bankr.S.D.Fla.1981). As the court pointed out in its findings of fact, the circumstances presented in this case convince the court that the debtor either made the false representation to the plaintiff

knowing it to be false or the debtor acted with gross recklessness in making the false representation that intent to deceive is inferred from debtor's conduct.

Accordingly, the plaintiff having established by clear and convincing evidence all the elements of § 523(a)(2)(A) with respect to $14,349.30 of plaintiff's claim, that amount will be declared nondischargeable.

■ Section 523(a)(4) of the Bankruptcy Code, the other section relied upon by the plaintiff in this action, reads in pertinent part as follows:

> (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> ....
>
> (4) for fraud or defalcation while acting in a fiduciary capacity....

11 U.S.C.A. § 523(a)(4) (West 1979). The plaintiff contends that under Tenn.Code Ann. § 66–11–138 the payments it made to the defendant were impressed with a trust such that the defendant had a fiduciary obligation to see to it the funds were used to pay Andrews for the supplies furnished in connection with the Oak Square project. Because the funds were not used to pay Andrews, the plaintiff argues the defendant's debt is nondischargeable under § 523(a)(4). Tenn.Code Ann. § 66–11–138 reads as follows:

> **66–11–138. Misapplication of contract payments—Felony.**—Any contractor, subcontractor, or other person who, with intent to defraud, shall use the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor performed on, or materials furnished by his order for, this specific improvement, while any amount for which he may be or become liable for such labor or materials remains unpaid, shall be guilty of a felony and punished accordingly.

Tenn.Code Ann. § 66–11–138 (1982).

The argument that Tenn.Code Ann. § 66–11–138 creates a fiduciary obligation within the meaning of § 523(a)(4) has been rejected by a number of bankruptcy courts in Tennessee. Judge Clive Bare succinctly disposed of such argument in *Wilson v. Mettetal (In re Mettetal)*, 41 B.R. 80, 88 (Bankr.E.D.Tenn.1984):

> Tenn.Code Ann. § 66–11–138 (1982) is not an explicit state builders trust fund statute; rather, it is merely a statute making the misapplication of construction funds a criminal offense. Were any trust deemed created under the statute, such a trust would clearly be only a trust *ex maleficio*, arising only upon occurrence of the unlawful act of misapplication. This statute does not create an express or technical trust necessary to establish a fiduciary relationship within the contemplation of 11 U.S.C.A. § 523(a)(4) (1979).

*Id.* at 88. *Accord Wilson v. Estes (In re Wilson)*, 30 B.R. 91, 94 n. 5 (Bankr.E.D. Tenn.1983); *Kannon v. Blalock (In re Blalock)*, 15 B.R. 33, 35 (Bankr.E.D.Tenn. 1981); *Noland Co. v. Edmondson (In re Cedar City Elevator & Refrigeration Co.)*, 14 B.R. 623 (Bankr.M.D.Tenn.1981); *Witt Building Material Co. v. Barker (In re Barker)*, 14 B.R. 852 (Bankr.E.D.Tenn. 1981); *see also Sequatchie Concrete Serv. v. Cutter Laboratories*, 616 S.W.2d 162, 166 (Tenn.Ct.App.1980).

Acknowledging the authority contrary to its argument, the plaintiff nevertheless argues the Tennessee Supreme Court recently held that a contractor in receipt of building contract funds is a fiduciary by reason of Tenn.Code Ann. § 66–11–138. The plaintiff cites the following quotation from *Hayes Pipe Supply v. McKendree Manor, Inc.*, 695 S.W.2d 174 (Tenn.1985) to support its position:

> The Court of Appeals noted that in some states when payments are made to a contractor by a landowner, the money becomes that of the contractor and he is thereafter free to apply it as he sees fit. Noting that such states impose very little duty upon the contractor, the Court of Appeals said:
>
> > "If the contractor has no duty to apply the money received from the owner to the account with the supplier in the owner's name, it follows that the supplier has no greater duty to apply the funds properly."
>
> While this may be the rule in some jurisdictions, it has no application under

Tennessee statutes. As stated previously, a contractor receiving payments from a landowner in this state is under a very strict statutory duty to apply those payments properly and not to divert them so as to leave the landowner exposed to the possibility of a lien.

695 S.W.2d at 179 (footnote omitted).

The above quotation from *Hayes* is not inconsistent with the conclusion that if a trust is deemed created by Tenn.Code Ann. § 66–11–138, it is a trust *ex maleficio*, that is, the trust only arises at the time of and because of the misappropriation. The *Hayes* court does not state that the statute creates an express or technical trust attendant with all the characteristics of such trust. Rather, the *Hayes* court merely points out that Tenn.Code Ann. § 66–11–138 requires a contractor to apply contract funds properly, failing which the contractor may be subject to criminal penalties. In short, nothing in *Hayes* persuades this court that it should depart from the holdings of previous cases which have rejected plaintiff's argument.

An appropriate order will enter.