**In re DIXIE–SHAMROCK OIL & GAS, INC., Debtor.**

**William C. MACK, et ux, Eileen K. Mack, Plaintiffs,**

**v.**

**DIXIE–SHAMROCK OIL & GAS, INC. and Sunbright Oil & Gas Company, Defendants.**

**Bankruptcy No. 383–03216. Adv. No. 384–0375.**

United States Bankruptcy Court, M.D. Tennessee.

Aug. 30, 1985.

Charles W. McElroy, Nashville, Tenn., for plaintiffs.

Karin D. Coble, Nashville, Tenn., Jo Beth Murphree, David Anderson, for Dixie-Shamrock Oil & Gas, Inc.

Glenn B. Rose, Nashville, Tenn., for Sunbright Oil & Gas. Co., Inc.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

This matter is before the court on motions for partial summary judgment filed by the defendants, Dixie-Shamrock Oil & Gas, Inc. and Sunbright Oil & Gas Co. (hereinafter referred to as "defendants"). The plaintiffs' nondischargeability complaint alleges nondischargeability on two separate grounds. First, plaintiffs allege that the defendant misrepresented its leaseholdings in Sunbright, Tennessee; its

position as the sole qualified operator in Sunbright, Tennessee; and the estimated production capacity of a well drilled on the plaintiffs' property. These misrepresentations, assert the plaintiffs, induced them to lease mineral rights and property to the defendants and to incur expenses by moving to Tennessee and building a residence. Second, the plaintiffs contend that the defendants polluted the ground water on their property by willfully and maliciously failing to properly cap a gas well drilled on the plaintiffs' property.

The defendants have moved for summary judgment claiming that the representations, even if made, were of future facts and cannot support an 11 U.S.C. § 523(a)(2) complaint, and that improper capping of the gas well was neither a willfully malicious action nor the cause of the ground water pollution. The defendant Dixie-Shamrock Oil & Gas, Inc. seeks summary judgment on the additional ground that Sunbright Oil & Gas Co. drilled the well as an independent contractor and, as such, is solely liable for improper drilling. Upon consideration of the exhibits, affidavits, briefs, statements of the parties, and the entire record, the court concludes that partial summary judgment should be GRANTED for the defendants on the plaintiffs' 11 U.S.C. § 523(a)(2) claim and that partial summary judgment should be DENIED on the plaintiffs' 11 U.S.C. § 523(a)(6) claim.

The following shall constitute findings of fact and conclusions of law pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

Since 1960, Mrs. Mack, a CPA of 31 years, and Mr. Mack, a U.S. Postal Service worker, had dreamed of building a retirement home in Sunbright, Tennessee. In 1970, the defendants purchased 76 acres of land in Sunbright, Tennessee, for $13,500. The property was undeveloped except for a trailer and a water well. From 1970 through 1975, the plaintiffs periodically vacationed on the property and used water from the well.

While the plaintiffs owned the property, they had been approached by several firms interested in leasing their property for oil and gas exploration. In July of 1980, the Macks received a telephone call from Mr. Houston Shannon, a representative of Dixie-Shamrock. Mr. Shannon was interested in leasing the mineral rights to their property on behalf of the defendant and sought an appointment with the plaintiffs. He visited the plaintiffs at their home and discussed the execution of an oil and gas lease.

The plaintiffs contend that Mr. Shannon, during his visit, made numerous misrepresentations which induced them to lease their property to the defendant Dixie-Shamrock. Mr. Shannon, assert the plaintiffs, represented that Dixie-Shamrock was the only operator qualified to drill in Sunbright, Tennessee, and had existing leases on properties contiguous to the tract owned by the plaintiffs. The plaintiffs further assert that Mr. Shannon promised that Dixie-Shamrock would perform all of the drilling operations on their property and that the assignment clause in the lease was merely a formality. Interested in developing their property and concerned with hampering the defendant's ability to develop the property of their neighbors, the plaintiffs executed an oil and gas lease in favor of Dixie-Shamrock on July 12, 1980.

Dixie-Shamrock, on July 6, 1981, entered into a farm-out agreement with Sunbright Oil & Gas Company. The agreement provided that Sunbright would have the right to drill two oil and gas wells on the property owned by the plaintiffs. Dixie-Shamrock agreed to convey mineral interests in the area surrounding the wells drilled by Sunbright. Sunbright agreed to pay the expenses of the wells, incur liability resulting from the drilling of the wells, and allow Dixie-Shamrock to drill on the property at any time before Sunbright commenced drilling operations. The farm-out agreement specifically provided that Sunbright was neither an agent nor a partner of Dixie-Shamrock and that Sunbright would operate as an independent contractor, assuming all liability for any damages caused by its operations on the land.

Pursuant to the farm-out agreement, Sunbright Oil drilled a well on the plaintiffs' property in the summer of 1981. Due to the lack of a gathering system to carry the gas to market, the gas well was shut in. The plaintiffs, interested in using gas from the well in a home on the property, asked Dixie-Shamrock about the production capacity of the gas well. Aware that the plaintiffs were planning to move onto the property and build a house, Mr. Shannon, a representative of Dixie-Shamrock, agreed to provide the plaintiffs with a deliverability test.

In March of 1982, the plaintiffs were given a copy of the results from the deliverability test. The plaintiffs contend that they contacted Mr. Doug Melton, a representative of Dixie-Shamrock, to have him explain the results of the test. The plaintiffs assert that Mr. Melton rated the well as an 8 out of 10; indicated that ⅕ of a cubic foot would be sufficient for each day of an average household's use; and, when asked if they should move to Tennessee, stated that the plaintiffs had a good well and he didn't see why they were hesitant to move.

Dixie-Shamrock contends that it made no representation concerning the deliverability test, but referred the plaintiffs to Mr. John Jewell. Dixie-Shamrock admits that it knew that the plaintiffs were motivated, in part, to move to Tennessee due to the prospect of free gas. However, Dixie-Shamrock stated that it made no representations as to the production capacity of the well and that Mr. Melton, its representative, when asked by the plaintiffs whether they should move to Sunbright, Tennessee, responded that he didn't know.

In September of 1982, Mr. Mack retired and moved to Sunbright, Tennessee. The following December his wife retired, sold their house in Florida, and in February of 1983 joined Mr. Mack. Since the plaintiffs were planning to construct a house on the property, they temporarily lived on the property in a trailer.

Prior to moving to Sunbright, the plaintiffs discovered that the water well on their property had gone dry. Rather than re-open the water well, the Macks decided to drill a new water well closer to the proposed location of their new house. The new well was 190 feet deep and was drilled in October of 1982. Mr. Mack believed that the water from the new well was palatable for a couple of weeks; however, in October of 1982, he discovered that the water tasted and smelled bad. Shortly after Mrs. Mack moved to Sunbright in February of 1983, she too noticed that the water from the new well smelled and tasted bad. Indeed, Mrs. Mack stated that the smell was so bad that it made her vomit and bathing was a nauseating experience.

Sometime prior to June of 1983, a repairman working on a regulator switch near the plaintiffs' water well lit a match and caught the water well on fire. At this time, the Macks had a water test performed and found that the water was contaminated with bacteria.

Despite the problems the plaintiffs were experiencing with their water supply, they decided to proceed with construction of the house on their Sunbright property. In June of 1983, the plaintiffs entered into a contract for the construction of their house. The vast majority of the expenses and suffering claimed as damages in this action resulted from the construction of a permanent residence on their property.

While the house was being finished, the plaintiffs visited the defendant Dixie-Shamrock on several occasions and expressed their pleasure with the free gas they were receiving from the well. However, in January and February of 1984, the gas well stopped producing gas, making it necessary for the plaintiffs to purchase propane to operate their appliances.

Plaintiffs, upset with their situation, began contacting several public agencies. First, the Macks wrote to the Environmental Protection Agency and complained that all the water in Sunbright was bad. Second, the plaintiffs sent photographs of the well to the Oil and Gas Board.

The state geologist told the plaintiffs that the well was no greater than a grade 1 well. In response to the photographs of the well, Mr. Gore, an Oil and Gas Board inspector, inspected the well and discovered that an insufficient amount of cement had been placed around the surface casing. In Mr. Gore's opinion, the well had been sufficiently sealed to prevent oil and gas from polluting the water supply despite the cement deficiency. The well was "red-tagged" and Mr. Hamby, a representative of Sunbright, at the plaintiffs' request subsequently plugged the well.

Contrary to Mr. Gore's affidavit, the plaintiffs have submitted an affidavit by Ollie L. Smith, Jr., a professional geologist specializing in ground water and environmental geology. Mr. Smith stated that he had examined the well on the property. He found that 50 bags of cement were used in an 8½" bore hole with 7" casing to a depth of 1,167 feet. Based on industry standards, he ·stated that 50 bags of cement was grossly insufficient to seal the well, and that an area of at least 500 feet below the surface was left unsealed. In his opinion, the cement used in the plaintiffs' well was inadequate to prevent contamination of ground water by natural gas escaping from the gas well bore hole. The plaintiffs' ground water, he stated, was polluted by natural gas escaping from the well drilled on the plaintiffs' property.

## I.

The plaintiffs contend that the defendant Dixie-Shamrock made two categories of misrepresentations which give rise to a nondischargeability claim pursuant to 11 U.S.C. § 523(a)(2). First, the plaintiffs allege that they were induced to enter into a mineral lease with Dixie-Shamrock based on misrepresentation concerning Dixie-Shamrock's drilling capabilities and drilling activities in the Sunbright area. Second, plaintiffs allege that they were induced to move to Tennessee and incur a large amount of expenses based on misrepresen-

tations made by Dixie-Shamrock representatives concerning the quality of the gas well drilled on their property. Defendant Dixie-Shamrock asserts that the first category of misrepresentations were not made and, even if they were made, they would not constitute misrepresentations of past or presently-existing facts. Dixie-Shamrock further asserts that no misrepresentations were made concerning the quality of the well and, even if they were made, they relate to future performance of the well and not misrepresentations of past or present facts.

▇▇▇▇ To sustain an objection to the dischargeability of a debt under § 523(a)(2)(A), the objecting party must prove five elements: "1. That the debtor made materially false representations; 2. That the debtor knew the representations were false at the time he made them; 3. That the debtor made the false representations with the intention and purpose of deceiving the creditor; 4. That the creditor reasonably relied upon the debtor's materially false representations; and, 5. That the creditor sustained loss and damages as a proximate result of the materially-false representations made by the debtor." *Heinold Commodities and Securities, Inc. v. Hunt*, 30 B.R. 425, 435 (M.D.Tenn.1983). In order to establish a misrepresentation, the plaintiff in a § 523(a)(2) action must establish not merely implied fraud but actual or positive fraud involving moral turpitude or intentional wrongdoing. *Hunt* at 436. Furthermore, "[i]t is well established that the false representations prohibited by § 523(a)(2)(A) must be representations of a past or existing fact; a mere promise or representation of intention to act is insufficient." *Everwed Co. v. Ayers*, 25 B.R. 762, 772 (Bankr.M.D.Tenn.1982).

▇▇▇▇ As to the first category of misrepresentations, the court need not decide whether the alleged misrepresentations were made and whether they were of past or future facts.[1] As will be discussed below, the plaintiff may not prevail on these

---

1. One of the misrepresentations alleged in the first category would, however, give rise to liability except for the fact that it is a misrepresentation of a future fact. The plaintiffs alleged that

claims, due to the lack of proximate cause. However, the second category of misrepresentations provide a different set of circumstances.

■ The court finds that a genuine issue of material fact does exist as to whether the defendant Dixie-Shamrock made misrepresentations to the plaintiffs concerning the results of the deliverability test. Credible evidence has been presented by both sides conflicting on this point. While it is true that the deliverability test predicts future productivity of the well, the plaintiffs have not alleged that the misrepresentation was the fact that the well was not productive but, rather, they have alleged that Dixie-Shamrock misrepresented the meaning of the deliverability test. The court finds that a genuine issue of material fact exists on this point and that summary judgment may not be granted on this issue in favor of the defendants.

The final element of a § 523(a)(2)(A) claim is one of proximate cause. Plaintiffs are required to establish that they sustained a loss as a proximate result of a materially-false representation by the debtor. A causal relationship must be established between the misrepresentation and the loss suffered. *Arterburn v. Arterburn*, 15 B.R. 189, 192 (Bankr.W.D.Okla. 1981). "In general, with only a few exceptions, the courts have restricted recovery to those damages which might foreseeably be expected to follow from the character of the misrepresentation itself.... It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered." PROSSER, HANDBOOK OF THE LAW OF TORTS at 732 (4th ed. 1971).

■ Misrepresentations alleged by the plaintiff regarding defendant Dixie-Shamrock's statements concerning its leasing of contiguous land and its position as the only qualified driller in Sunbright, Tennessee, may have induced the plaintiffs to lease the mineral rights to the defendant. However, damages alleged by the plaintiffs did not arise from their leasing arrangement with the defendant. The plaintiffs allege damage resulting from the improper drilling of the well and from misrepresentations which allegedly caused them to relocate in Sunbright, Tennessee. The court finds that the nature of the representations (i.e., Shamrock's leasehold interest and drilling qualifications in Sunbright, Tennessee) do not give rise to the damages allegedly resulting from the well drilled on the plaintiffs' property. Accordingly, the court finds, as a matter of law, the defendant Dixie-Shamrock is entitled to summary judgment in its favor on this category of misrepresentations.[2]

■ Finally, the defendant Sunbright Oil Company has moved for summary judgment on the plaintiffs' § 523(a)(2)(A) claim on the ground that plaintiff has established no misrepresentations made by Sunbright. Sunbright tendered a deposition of the plaintiff Mr. Mack, in which the plaintiff states the misrepresentations made by Sunbright can be found in the records on file with the Tennessee Oil and Gas Commission. Specifically, Mr. Mack stated that the defendant Sunbright Oil and Gas falsely stated the date on which the well was drilled. From the evidence before the court, the court finds that, even if this misrepresentation was made, it would not be actionable under § 523(a)(2)(A). Accordingly, the court holds that the defendant Sunbright Oil and Gas Company, Inc. is entitled to partial summary judgment on the § 523(a)(2)(A) claims.

## II.

Pursuant to 11 U.S.C. § 523(a)(6), the plaintiffs contend that the defendants pol-

---

the defendant Dixie-Shamrock stated that it would do the drilling on plaintiffs' property itself. This representation was a promise as to a future activity and, accordingly, may not provide the basis for nondischargeability under § 523(a)(2)(A). Accordingly, the court will grant partial summary judgment to the defendants on this claim.

**2.** "Of course, a summary judgment motion may be made on the basis of pleadings alone, and if this is done it functionally is the same as a motion to dismiss for failure to state a claim or for judgment on the pleadings." C. WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, § 2713 at 594 (2nd ed. 1983).

luted their ground water supply by willfully and maliciously failing to properly cap the gas well on the property. The defendant Dixie-Shamrock claims that the defendants were merely negligent and that Sunbright Oil and Gas Company, as an independent contractor is fully liable for any damage resulting from drilling.

■ Debt for "willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable pursuant to § 523(a)(6). To be nondischargeable under § 523(a)(6), plaintiffs' claim must result from action by the debtor which was deliberate or intentional and in knowing disregard of the rights of the injured party. *Shelton v. Smith*, 37 B.R. 996, 999 (Bankr.M.D.Tenn.1984); *Everwed Co. v. Ayers*, 25 B.R. 762, 776 (Bankr.M.D.Tenn.1982). "The word 'willful' means 'deliberate or intentional', a deliberate and intentional act which necessarily leads to injury." L. KING, 3 COLLIER ON BANKRUPTCY, § 523.16 at 523–129 (15th ed. 1985). A malicious injury is one which "... was wrongful and without just cause or excessive, even in the absence of personal hatred, spite or ill will." COLLIER, at 523–129. *See Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904).

■ The defendants' assertion that this claim may only be recognizable as a negligence action is without substance. The court is without sufficient facts to determine whether or not the actions of the defendants were willful and malicious and, accordingly, cannot grant summary judgment on that ground.

■ The defendants claim that Sunbright acted as an independent contractor and, thus, Dixie-Shamrock may not be held liable for its actions. The court has examined the farm-out agreement entered into between Sunbright and Dixie-Shamrock. While this agreement states that Sunbright will act as an independent contractor, the court has insufficient facts before it to determine whether Sunbright did in fact act in that capacity. The court has little

evidence from which to determine what control Dixie-Shamrock exercised over Sunbright Oil and Gas Company. Accordingly, the court cannot grant summary judgment in favor of Dixie-Shamrock on this issue. Additional facts must be developed in order for the court to determine the nature of the relationship between the two defendants, Dixie-Shamrock and Sunbright Oil and Gas Company, Inc.

Finally, the defendant Dixie-Shamrock has sought summary judgment on the grounds that the damages sought by the plaintiffs are, for the most part, not recoverable. The court will not rule on this issue at this time but will take the issue of recoverability of damages under advisement.

Accordingly, the court hereby ORDERS, ADJUDGES, AND DECREES that partial summary judgment shall be GRANTED in favor of the defendants on the plaintiffs' § 523(a)(2)(A) claim; partial summary judgment for the defendants is DENIED on the plaintiffs' § 523(a)(6) claim; and the court will take under advisement the defendant Dixie-Shamrock's motion for summary judgment on the damages issue.

IT IS, THEREFORE, SO ORDERED.