In re Bernard W. CERAR and Monique M. Cerar, Debtors.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of the Atkinson Trust & Savings Bank, Plaintiff,

v.

Bernard W. CERAR and Monique M. Cerar, Defendants.

Bankruptcy No. 184–01602.

Adv. No. 86–8052.

United States Bankruptcy Court, C.D. Illinois.

March 22, 1988.

Dale G. Haake, Rock Island, Ill., for plaintiff.

B. Douglas Stephens, Jr., Rock Island, Ill., for debtors/defendants.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

This is an adversary action filed by the Federal Deposit Insurance Corporation (referred to as FDIC), as receiver of the Atkinson Trust & Savings Bank (referred to as BANK), against Bernard Cerar and his wife, Monique Cerar (jointly referred to as

the DEBTORS) seeking to have certain debts originally owing to the BANK by Bernard Cerar (individually referred to as CERAR), and guaranteed by Monique Cerar, declared nondischargeable under Section 523 of the Bankruptcy Code, 11 U.S.C. Section 523.

CERAR had established a non-banking business relationship with Vince Causemaker (referred to as CAUSEMAKER). CAUSEMAKER then acquired an ownership interest in the BANK and solicited CERAR to become a customer of the BANK. In 1969 a banking relationship was established. Starting in September of 1979, and continuing into February of 1983, the BANK made several loans to CERAR. These loans were renewed, and in some cases, consolidated. By April of 1983, CERAR owed the BANK $204,700.00 evidenced by four promissory notes; one in the amount of $33,400.00. Monique Cerar guaranteed these notes. On August 18, 1981 CERAR gave the BANK a financial statement which indicated assets of $545,000.00, liabilities of $238,400.00, and a net worth of $306,600.00.

In April of 1983 the BANK determined it had exceeded its legal lending limits by $33,400.00.[1] CAUSEMAKER approached CERAR and told him of the overline position and that it could be concealed from the bank examiners if CERAR forged his son, Mark Cerar's, name to another note and it was temporarily substituted for the note which created the overline position. At first, CERAR refused, but later, after again being told by CAUSEMAKER the note was needed to protect the BANK from the bank examiners and the BANK would foreclose on the security for the loans if CERAR did not cooperate, CERAR forged his son's name to a note dated April 1, 1983, for $33,400.00 and delivered it to CAUSEMAKER. He also signed a guaranty for the fictitious debt of his son. The BANK retained the overline note to enforce against CERAR once the deception was completed.

Approximately one month later, the DEBTORS consulted an attorney. Their attorney wrote to both the BANK and the BANK's attorney, demanding the forged note be cancelled and returned to them. Neither the DEBTORS nor their attorney ever informed the FDIC or state banking authorities as to what had occurred.

The Bank failed in November of 1983, and the FDIC was appointed receiver. In August of 1984, the DEBTORS filed a Chapter 13, which was converted to a Chapter 11 in October of 1984, which in turn was converted to a Chapter 7 in December of 1985. The FDIC contacted CERAR and obtained a financial statement dated January 25, 1984, showing assets of $105,009.50, liabilities of $277,013.20 and a negative net worth of $172.003.70. At approximately the same time, the FDIC obtained three appraisals which indicated the security for the loans was worth substantially less than that shown on the financial statement previously given to the BANK.

In February of 1986, the FDIC filed a 4–Count complaint. Count I is under Section 523(a)(2)(A) alleging the execution and delivery of the forged note constituted the obtaining of money, property, services or extension, renewal, or refinancing of credit by false pretenses, false representation or actual fraud. Count II is under Section 523(a)(6) alleging the execution and delivery of the forged note constituted a willful and malicious injury to the FDIC. Both Count I and Count II seek to have $33,400.00 declared a nondischargeable debt. Count III is under Section 523(a)(2)(B) alleging the August 18, 1981 financial statement was false, and seeks to have all the indebtedness declared nondischargeable.[2]

The discharge provisions of Section 523 are construed strictly against a creditor and liberally in favor of a debtor. *In re Pochel*, 64 B.R. 82 (Bkrtcy.C.D.Ill.1986). A creditor has the burden of proving each element of the exception to discharge on which he is relying. *In re Bogstad*, 779

---

1. The term overline or overline position is used to describe a borrower who has exceeded a bank's legal lending limits.

2. Count IV was subsequently withdrawn.

F.2d 370 (7th Cir.1985). The proof must be by clear and convincing evidence. *In re Bonnett,* 73 B.R. 715 (C.D.Ill.1987).

■ As to Monique Cerar, the FDIC's evidence was totally lacking and failed to establish any actions on her part which would permit a denial of her discharge on any of the three counts. Her testimony remains unrefuted that she was in no way involved with the forged note and she found out about it later when she went to the attorney's office with her husband in an attempt to rectify the matter. Furthermore, she did not sign the August 18, 1981, financial statement and, other than guaranteeing his debts, she did not participate in any of the loan transactions involving her husband. Therefore, this court holds Monique Cerar should be discharged from all the obligations arising out of her guaranty.

The first count against CERAR is under Section 523(a)(2)(A) alleging the execution and delivery of the forged note constituted the obtaining of money, property, services, or an extension, renewal, or refinancing of credit by false pretenses, false representation, or actual fraud. In order to establish an action under Section 523(a)(2)(A) the FDIC must prove by clear and convincing evidence (1) CERAR made a representation, (2) which was materially false, (3) known to be materially false, (4) made with the intent and purpose of deceiving the FDIC, (5) there was reasonable reliance upon such representation, and (6) money, property or services, or an extension, renewal, or refinancing of credit was obtained as a result of the false representation. *In re Doppelt,* 57 B.R. 124 (Bankrtcy.N.D.Ill.1986); *In re Dixie Shamrock Oil & Gas, Inc.,* 53 B.R. 262 (Bkrtcy.M.D. Tenn.1985).

It is not disputed CERAR intentionally and knowingly gave the forged note to the BANK. Therefore, there is no issue as to the first three elements. The fourth element involves intent. Intent is difficult to ascertain and usually is determined from the surrounding circumstances. *In re Scoggins,* 52 B.R. 86 (Bkrtcy.N.D.Ala. 1985). CERAR testified he did not intend to injure the FDIC. However, he knew the

forged note was to be used to hide his overline loan from the bank examiners and he gave the forged note with that purpose in mind. These circumstances manifestly outweigh CERAR's mere assertion, and establish deceit was intended when he gave the forged note.

CERAR's position as to Count I is twofold. First he takes the position there was no reliance. This position has two aspects to it. The BANK did not rely on the forged note because of CAUSEMAKER's participation. Nor did the FDIC which did not examine the loan file. Without examining the loan file, the FDIC could not have known of the existence of the forged note. Had the FDIC done so, it would have discovered the attempts to recover the forged note. Second, he takes the position the giving of the forged note constituted forbearance and that forbearance does not constitute the obtaining of money, property or services or an extension, renewal or refinancing of credit.

Turning to CERAR's first position, there is no factual dispute the forged note was given at CAUSEMAKER's suggestion and there was collusion between CERAR and CAUSEMAKER to hide the overline position from the bank examiners. In a normal bank-borrower relationship such action by a bank officer would be sufficient to destroy the reliance element. However, the FDIC is entitled to rely on the forged note as a matter of law. *In re Boebel,* 17 C.B.C. 2d 1178, 79 B.R. 381 (Bkrtcy.N.D.Ill.1987); *In re Bombard,* 59 B.R. 952 (Bkrtcy.D. Mass.1986). Neither the FDIC's knowledge, or lack thereof, about the forged note and the DEBTORS' attempts to recover it, or CERAR's intent is material.

In *FDIC v. Langley,* 792 F.2d 541, *aff'd. on appeal Langley v. FDIC,* — U.S. —, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987), the court had to consider the import of knowledge by the FDIC. The defendants borrowed from the bank to acquire real estate. When the FDIC sued to collect the debt, the defendants raised as a defense alleged misrepresentations by the bank as to the real estate which induced them to borrow and acquire the real estate. The

FDIC's response was that 12 U.S.C. Section 1823(e)[3] prevented the defendants from raising the defense. The defendants took the position that even if a misrepresentation concerning an existing fact constitutes an agreement covered by Section 1823(e), it did not do so when the misrepresentation was fraudulent and the FDIC had knowledge of the asserted defense at the time it acquired the note. In holding the defendants liable, the court stated that the FDIC's knowledge (whether actual or constructive) of the alleged defense is immaterial under Section 1823(e). In affirming on appeal, the Supreme Court, in *Langley v. FDIC, supra,* stated:

"While the borrower who has relied upon an erroneous or even fraudulent unrecorded representation has some claim to consideration, so do those who are harmed by his failure to protect himself by assuring that his agreement is approved and recorded in accordance with the statute. Harm to the FDIC (and those who rely upon the solvency of its fund) is not avoided by knowledge at the time of acquiring the note. The FDIC is an insurer of the bank, and is liable for the depositors' insured losses whether or not it decides to acquire the note. Cf. 12 U.S.C. Section 1821(f). The harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measures, including termination of the bank's deposit insurance. See Section 1818. Thus, insofar as the recording provision is concerned, the state of the FDIC's knowledge at that time is what is crucial. But as we discussed earlier, see *supra,* at 401, Section 1823(e) is meant to ensure more than just the FDIC's ability to rely on bank

records at the time of an examination or acquisition. The statutory requirements that an agreement be approved by the bank's board or loan committee and filed contemporaneously in the bank's records assure prudent consideration of the loan before it is made, and protect against collusive reconstruction of loan terms by bank officials and borrowers (whose interests may well coincide when a bank is about to fail). Knowledge by the FDIC could substitute for the latter protection only if it existed at the very moment the agreement was concluded, and could substitute for the former assurance not at all."

In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the court in considering the effect of a defendant's intent in an action brought by the FDIC, stated:

"But the reach of the rule which prevents an accommodation maker of a note from setting up the defense of no consideration against a bank or its receiver or creditors is not delimited to those instances where he has committed a statutory offense. As indicated by the cases cited in the *Deitrick* [*v. Greaney*] case (309 U.S. [190] p. 198) [60 S.Ct. 480, 484, 84 L.Ed. 694 (1940) ]), an accommodation maker is not allowed that defense as against the receiver of the bank and its creditors, or at times even as against the bank itself, where his act contravenes a general policy to protect the institution of banking from such secret agreements. In some of those cases, the accommodation maker was party to the scheme of deception, in the sense that he had full knowledge of the intended use of the paper. [Citations omitted] In others he had 'no positive idea of committing any fraud upon any one.' [Citations omitted] Yet, he has not been allowed to escape

**3.** Section 1823(e) provides as follows:

"No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming

an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank."

liability on the note as against the receiver even though he was 'very ignorant and ill-informed of the character of the transaction.' [Citation omitted] Indeed, recovery was allowed by the bank itself in *Mount Vernon Trust Co. v. Bergoff, supra,* where the court said (272 N.Y. [192] p. 196, 5 N.E.2d [196] 197 [1936]):

> 'The defendant may not have intended to deceive any person, but when she executed and delivered to the plaintiff bank an instrument in the form of a note, she was chargeable with knowledge that, for the accommodation of the bank, she was aiding the bank to conceal the actual transaction. Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.'"

■ The case before this Court presents a classic situation for the application of the principles stated in *Langley* and *D'Oench* —collusion between a bank officer and a borrower to reconstruct a bank loan. CERAR was liable on the original note he signed. For the purpose of avoiding immediate payment and deceiving the bank examiners the forged note was given to the BANK and placed in the BANK's file with the unwritten agreement the forged note was not to be enforced. CERAR was fully aware of the intended use of the forged note and his actions were instrumental in causing the forged note to be placed in the BANK's loan file. The FDIC did not have to examine the BANK's loan file to determine the existence of the forged note and actually rely on it. Nor can CERAR take refuge with the position that had the FDIC conducted an examination it would have discovered the attempt to recover the forged note. As was pointed out in *Langley,* when the situation involves collusion between a bank officer and a borrower, the key point in time is when the collusive agreement is struck. In this case, at that point in time, the FDIC could not have knowledge of the attempts to revoke the forged note because such attempts did not

occur until one month later. Therefore, any knowledge which the FDIC might have acquired through a subsequent examination would not afford CERAR any protection.

■ Relying on *In re Bacher,* 47 B.R. 825 (Bkrtcy.E.D.Penn.1985), CERAR's second position is that the forged note amounted to a forbearance, and forbearance does not constitute a granting of credit or extension or renewal or refinancing of credit. This Court believes the better view to be that forbearance may constitute an extension of credit. In *In re Fields,* 44 B.R. 322 (Bkrtcy.S.D.Fla.1984), the debtor sold property in which the creditor had a security interest without turning any of the proceeds over to the creditor, in contravention of the security agreement. When the creditor visited the debtor's business premises to check on its inventory, the debtor temporarily procured the return of the equipment from the purchasers. Discussing whether the debtor obtained an extension of credit, the court noted:

> " 'In commercial law and usage, an extension means an indulgence by a creditor giving his debtor further time to pay an existing debt. When we speak of obtaining an extension of a promissory note or other obligation, we mean, not an increasing of the amount of the debt, but an extension of the time of payment.' *State v. Mestayer,* 144 La. 601, 80 So. 891, 892 (1919) (Citation omitted)."

The court, in holding that the creditor "involuntarily" granted an extension of credit, went on to state that the statute should not be construed to protect only those creditors who voluntarily grant an extension of credit but not those who are deceived into forbearing collection efforts. In the case before this Court there was an agreement, certainly tacit if not express, that the BANK would forgo collection efforts if CERAR would forge his son's signature to a second note, thereby extending the repayment of the note.

As the FDIC proved all six of the elements of an action under Section 523(a)(2)(A), this Court holds that as to

CERAR Count I of the complaint should be allowed.

■ Count II of the complaint is under Section 523(a)(6) for willful and malicious injury. In order to establish the case under Section 523(a)(6) the FDIC must prove three elements, (1) a willful and malicious act; (2) done without cause or excuse; (3) that leads to harm. *Matter of DeVier,* 57 B.R. 602 (Bkrtcy.E.D.Mich.1986). CERAR first contends he had no intent to injure anyone. His actions were motivated by his desire to avoid foreclosure. Furthermore, lack of such intent is evidenced by his attempts to recover the forged note. Second, he contends the FDIC failed to prove it was injured or that his action led to any injury. In support of his position, he again alludes to the FDIC's knowledge of the events, and argues the proximate cause of the injury was the action of CAUSEMAKER.

■ CERAR's first contention affects both the first and second elements of a Section 523(a)(6) action. Starting with the first element, CERAR's first contention fails either under a classical application of Section 523(a)(6) or due to the principles expressed in *D'Oench, Duhme & Co. v. FDIC, supra.* CERAR's act of forging the note was a willful act. The issue remains as to whether the act was malicious. Two lines of authority have developed as to the legal standard for deciding what is a "malicious" act. One line requires an actual conscious intent to financially injure the creditor. *In re Mettetal,* 41 B.R. 80 (Bkrtcy.D.Tenn.1984). The other line adopts a less stringent standard of implied or constructive malice, holding that where an act is deliberately and intentionally done with knowing disregard for the rights of another, it falls within the statutory definition of malice, even though there is an absence of malice towards a particular creditor. *United Bank of Southgate v. Nelson,* 35 B.R. 766 (N.D.Ill.1983); *In the Matter of Ries,* 22 B.R. 343 (Bkrtcy.W.D. Wis.1982). The court's opinion in *United Bank of Southgate v. Nelson, supra,* contains an extensive analysis of the history of the willful and malicious act element of

Section 523(a)(6), and comes to the conclusion that willful and malicious injury means a deliberate or intentional act in which a debtor knows his act would harm a creditor's interest and proceeds in the face of that knowledge. This Court believes the analysis found in *United Bank of Southgate v. Nelson, supra,* is the correct one, and as is stated in both that case and *In the Matter of Ries, supra,* the cases following the stricter standard place an almost insurmountable burden on creditors, a burden which this Court is likewise not comfortable with. In the case before this Court, CERAR knew the BANK was regulated and subject to FDIC examination, and that the forged note would be used to conceal the overline situation from the BANK examiners, and he proceeded in the face of that knowledge to deliberately and intentionally forge the note. CERAR's first contention as it applies to the first element of Section 523(a)(6) also fails because of the impact of *D'Oench, Duhme & Co. v. FDIC, supra.* Regardless of whether CERAR was fully informed of the intended use of the forged note, which he was, or ignorant of its intended use, which he wasn't, he is responsible to the FDIC for his actions. Therefore, this Court finds CERAR's action, in addition to being willful, was malicious.

The next issue was whether CERAR's actions were done without cause. He takes the position cause exists because he was coerced into forging the note under the BANK's threat of foreclosure. The general rules applicable to such a position is that duress in procuring a note ordinarily renders it unenforceable in the hands of the payee or any person not a holder in due course. 28 I.L.P. *Negotiable Instruments,* Section 73. Duress is defined to be a condition which exists where one is induced by an unlawful act of another to make a note under circumstances which deprive him of the exercise of free will, and there must be such compulsion present and operating at the time the instrument is executed and shows that the execution of the instrument is not voluntary. *City of Fairfield v. Sexton Mfg.,* 35 N.E.2d 98, 311 Ill.App. 294 (1941).

In *Hart v. Strong*, 55 N.E. 629, 183 Ill. 349 (1899), the court had before it the issue of whether a threat to foreclose a mortgage was duress. The court held that an allegation of threatened foreclosure of a trust deed which was due and which could be foreclosed did not constitute duress. In the later case of *Kaplan v. Kaplan*, 182 N.E.2d 706, 25 Ill.2d 181 (1962), the Illinois Supreme Court discussed the defense of duress as follows:

"Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will, and it may be conceded that a contract executed under duress is voidable. (*Shlensky v. Shlensky*, 369 Ill. 179, [15 N.E.2d 694 (1938)]; 12 I.L.P., Contracts, sec. 126; Restatement of Contracts, Section 492.) Acts or threats cannot constitute duress unless they are wrongful; however, the rule is not limited to acts that are criminal, tortious or in violation of a contractual duty, but extends to acts that are wrongful in a moral sense. (Restatement of Contracts, Section 492, comment g.) At common law duress meant only duress of the person, that is a threat to life, limb or liberty, and the threat must have been of a nature as to create such fear as would impel a person of ordinary courage to yield to it. (*Illinois Merchants Trust Co. v. Harvey*, 335 Ill. 284 [167 N.E. 69 (1929)]; 17A Am.Jur., Duress and Undue Influence, sec. 10.) Under modern views and developments, however, duress is no longer confined to situations involving threats of personal injury or imprisonment, and the standard of whether a man of ordinary courage would yield to the threat has been supplanted by a test which inquires whether the threat has left the individual bereft of the quality of mind essential to the making of a contract. (*Decker v. Decker*, 324 Ill. 457 [155 N.E. 349 (1927)]; *Slade v. Slade*, 310 Ill.App. 77, [33 N.E.2d 951 (1941)]; 17A Am.Jur., Duress and Undue Influence, sec. II.) Any wrongful threat which actually puts the victim in such fear as to act against his will constitutes duress and, according to some authorities, a threat of personal or family disgrace may be of such gravity as to deprive the person threatened of the mental capacity necessary to execute a valid contract. (*Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496 [1952]; *Fox v. Piercey*, 119 Utah 367, 227 P.2d 763 [1951]; *Coleman v. Crescent Wire Cable Co.* 350 Mo. 781, 168 S.W.2d 1060 [1943].) Generally, as stated in 17A Am.Jur., Duress and Undue Influence, sec. II, p. 573, 'the threat must be of such nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect, and the act sought to be avoided must be performed by the person while in that condition * * *.' "

The court then went on to hold duress was not alleged where a wife obtained a property settlement agreement by threatening publication of photographs of the husband and another woman through suit for alienation of affections, stating:

"This allegation clearly presents no basis for a claim of duress inasmuch as it is well established that it is not duress to institute or threaten to institute civil suits, or for a person to declare that he intends to use the courts to insist upon what he believes to be his legal rights, at least where the threatened action is made in the honest belief that a good cause of action exists, and does not involve some actual or threatened abuse of process."

In the case before this Court the evidence does not justify a finding of duress. There was no proof that CAUSEMAKER'S actions were such as to control CERAR's will, or render him bereft of the quality of mind necessary to contract. There was no proof the foreclosure was not a legal right possessed by the BANK and that the foreclosure would constitute an abuse of process.

But even if the threatened action constituted duress, it could not be raised against the FDIC. The FDIC's status is similar to a holder in due course, *In re*

*Bombard, supra,* and as previously noted, duress cannot be raised against a holder in due course. *See also Porter v. First National Bank,* 212 Ill.App. 250 (1918); and Section 3–305 Uniform Commercial Code, Ill.Rev.Stat. 1985, Ch. 26, para. 3–305.

■ Nor can CERAR rely upon the fact that he attempted to rescind his action. Not only were his attempts of rescission unsuccessful, but they were limited to contacting the BANK and its attorney, without any attempt to contact the regulators, including the FDIC, who would be, and were in this case, ultimately damaged by his original action. CERAR's failure to notify the regulators was an act which ratified and perpetrated the deception. *FDIC v. Motorlease, Inc.,* 56 Misc.2d 306, 288 N.Y. S. 356 (S.Ct.1967).

■ The last element which had to be established under Section 523(a)(6) was that CERAR's action led to harm. His second contention affects this element. The purpose of the bank regulation establishing lending limits to any one borrower is to protect the bank from lending excessive funds to any one borrower, so that in the event that borrower fails to repay, the bank would not be placed in financial difficulty. The FDIC insures deposits so the depositors will be paid in the event the bank fails. Therefore, when CERAR forged the note which permitted the BANK to continue to retain the excess loans on its books, a situation of potential harm was created for both the BANK and the FDIC. This potential came to fruition when the BANK failed and the FDIC was forced to take over the BANK. Admittedly, there may have been other reasons why the BANK failed, but CERAR's actions contributed to the failure and were of the type which the regulation was intended to prohibit. This opinion has already addressed the importance of the FDIC's knowledge and the impact of CAUSEMAKER's actions, and those comments will not be repeated.

As all the elements of Section 523(a)(6) have been established, this Court holds that as to CERAR, Count II of the complaint should be allowed.

Count III of the complaint against CERAR is under Section 523(a)(2)(B) alleging that the loans were made pursuant to a false financial statement. In order to establish its position under Section 523(a)(2)(B) the FDIC must prove through clear and convincing evidence (1) the loan was made (2) pursuant to a written statement (3) which was materially false (4) respecting CERAR's financial condition (5) published by CERAR with intent to deceive (6) upon which there is reliance. *In the Matter of Granovetter,* 29 B.R. 631 (Bkrtcy.E.D.N.Y.1983).

■ This Court is not convinced the financial statements were materially false, they were published with intent to deceive, or that they were relied upon by the BANK. The only evidence that the August 18, 1981 financial statement was materially false was the testimony of the FDIC employee who testified that approximately twenty-nine months later CERAR gave a financial statement indicating that the assets were worth substantially less than that shown on the August 18, 1981 financial statement. This evidence is not persuasive because the crucial time for determining the value of the assets was when the financial statement was given and not some twenty-nine months later. In the intervening time a variety of things could have happened which could have affected the value of the assets. "Intent" is difficult to establish, and usually the court will look to the surrounding circumstances to determine if there was an intent to deceive. *In re Scoggins,* 52 B.R. 86 (Bkrtcy.N.D. Ala.1985). In this particular case the surrounding circumstances do not indicate anything other than a situation where CAUSEMAKER casually asked for a financial statement and it was given in an equally casual manner. Finally, there was no proof that CAUSEMAKER relied upon the financial statement. CERAR's testimony stands unrefuted that some of the financial statements were prepared by bank officers from information at their disposal and that he merely glanced at and signed them in response to CAUSEMAKER's request. He also indicated that CAUSEMAKER visited

his place of business regularly and was familiar with his business assets and their value. It is difficult for this Court to see how, under those circumstances, it could be said the BANK relied on the financial statement.

Nor does this Court feel that in this particular situation the FDIC can claim a special status. Special status is afforded the FDIC to protect it against unwritten agreements or fraudulent collusion between bank officers and borrowers. The act of giving the forged note was separate and distinct from the act of giving the false financial statement and there isn't any indication that the financial statement involved any kind of unwritten agreement or collusive act between the bank officers and CERAR.

Therefore, this Court holds that as to CERAR, Count III of the Complaint should be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion filed this day:

IT IS, THEREFORE, ORDERED:

That the Complaint of the Plaintiff is hereby DENIED as to Monique M. Cerar, and as to Bernard W. Cerar is ALLOWED as to Counts I and II, and DENIED as to Count III, and that judgment in the amount of $33,400.00 is entered in favor of the Plaintiff, Federal Deposit Insurance Corporation, as Receiver of the Atkinson Trust & Savings Bank, and against the Defendant, Bernard W. Cerar, and debt in the amount of $33,400.00 is declared to be nondischargeable.